ARTHUR A. KEEFE *vs.* IRVING J. JOHNSON.

SAME *vs.* IRVING J. JOHNSON & another.

Worcester.    September 26, 1939. — December 28, 1939.

Present: FIELD, C.J., DONAHUE, QUA, COX, & RONAN, JJ.

*Practice, Civil,* Auditor: findings, drawing of inferences from findings. *Malicious Prosecution.*

Although findings of subsidiary facts reported, without the evidence, by an auditor whose findings were to be final must stand, his conclusions of fact reached by inference solely from those subsidiary facts are open to review as matters of fact not only by the trial court but also by this court.

Upon findings that the defendants in an action for malicious prosecution, as a result of a rumor respecting a matter concerning them as public officials, interviewed certain persons, obtained from them affidavits to the effect that the plaintiff by a false representation had obtained money from one of the affiants in connection with such matter, and then placed the matter before a district court judge who, after some inquiry of one of the affiants, directed a complaint to issue against the plaintiff for obtaining money under false pretences with intent to

defraud, the proper conclusion was that the defendants had not acted without probable cause although it also appeared that the affidavits were not true and that the plaintiff was found not guilty upon failure to prosecute the complaint.

Two ACTIONS OF TORT. Writs in the Superior Court dated July 1, 1935.

Upon reports of an auditor whose findings were to be final, and who found for the plaintiff, judgments were ordered for the defendants by *Donnelly,* J. The plaintiff alleged exceptions.

*C. E. Tupper,* for the plaintiff.

*E. G. Norman,* for the defendants.

QUA, J. These are actions for malicious prosecution of the plaintiff on a charge of obtaining money under false pretences with intent to defraud.

The cases came before the trial court and now come before us upon first and supplemental reports of an auditor whose findings of fact were to be final. The practice in such cases differs materially from that prevailing in cases where an auditor's findings are not final and are merely *prima facie* evidence at a subsequent trial. See *Cook* v. *Farm Service Stores, Inc.* 301 Mass. 564. In cases like those now before us the auditor's report becomes a case stated. His subsidiary findings of fact must stand, unless it appears that there was no evidence sufficient in law to warrant them, but his conclusions of fact reached by inference solely from his subsidiary findings are open to review as matter of fact both by the trial court and by this court when the case comes here, and as to such conclusions this court is not bound by the finding of the trial court but must use its own judgment. *United States Fidelity & Guaranty Co.* v. *English Construction Co.* 303 Mass. 105, 108–109. In the cases at bar the evidence is not reported, and the subsidiary findings which the auditor has made in detail, as it was his duty to do, must be accepted as final. He has stated in substance that his further conclusions of fact are derived by inference from his subsidiary findings. It is therefore our function to determine what ultimate conclusions we think should flow from the subsidiary findings, and whether

or not those conclusions should lead to a judgment for the plaintiff. There is nothing to the contrary in *Rosenblum* v. *Ginis*, 297 Mass. 493. In that case the auditor's findings of fact were not final, and his ultimate conclusions did not purport to rest solely upon his subsidiary findings.

A vital question in the cases is whether the plaintiff has shown that the criminal prosecution was instituted without probable cause to believe the plaintiff guilty of the charge. The subsidiary findings bearing on this issue are here briefly summarized. The plaintiff was a deputy sheriff of the county of Worcester. He lived in Oxford. The defendants were two of the selectmen of the town. As a result of political contacts and opposition the defendants had become very unfriendly with the plaintiff, and he entertained a similar feeling towards them. One Peter J. Degnan, also of Oxford, owned a tavern there, occupied by an unsatisfactory tenant who was operating under a "beer and light wines" license, and whom Degnan desired to replace with a better tenant. Degnan applied to the selectmen for an "all alcoholic" license at the tavern, and his sister, Dorothy Degnan, applied for a "beer and wine" license. Late in 1934, before the licenses were issued for 1935, the plaintiff told Degnan that he, the plaintiff, would be glad to help Degnan obtain a new tenant. The plaintiff expected to be paid if he succeeded. The plaintiff produced one Leary as a satisfactory tenant willing to take a lease of the tavern if he could get a license to sell "all alcoholic beverages." After some approaches to the selectmen the plaintiff concluded that the license could not be obtained for Leary. Early in December he informed Degnan that he could do nothing further in that line. The liquor licenses were granted on December 15, 1934. No "all alcoholic" license was granted for the tavern. A "beer and light wine" license was granted to Dorothy Degnan. Peter's application was denied. A few days later, although the plaintiff had been unsuccessful, Peter Degnan, at the suggestion of his attorney, made in Dorothy's presence a "gratuitous payment" of $25 to the plaintiff in recognition of the plaintiff's effort to obtain an "all alcoholic" license. In February, 1935, the defendant

Johnson was told by "someone about town" that Degnan had paid the plaintiff some money in connection with the granting of a liquor license for the tavern. Thereupon Johnson called at Degnan's home and, Peter not being in, made inquiries of Dorothy. She told Johnson that she had seen Peter pay the plaintiff $25 after the plaintiff had stated that he had obtained a liquor license for the tavern. She promised to sign an affidavit to that effect. On February 23, Johnson returned with a typewritten affidavit. Dorothy Degnan signed this and made oath to it before Johnson as notary public. The body of the affidavit read as follows: "Dorothy A. Degnan of Oxford in said County and State, being duly sworn says, that in the month of December 1934 Arthur A. Keefe, Sheriff, of Oxford, called at our home and stated that a liquor license had been gotten for us and at that time I saw him receive from my brother Peter J. Degnan the sum of twenty-five (25) dollars, as a matter of fact no license had been granted us up to this time." Johnson showed this affidavit to the defendant Powers, and on March 2 both defendants visited the Degnan home. They talked with Peter Degnan about Dorothy's affidavit and asked him if he was willing to sign one. He was somewhat hesitant, but being urged by Dorothy signed and swore to this affidavit: "Peter J. Degnan, County and State aforesaid being duly sworn says that during the month of December 1934, Arthur A. Keith [sic] Deputy Sheriff of said Oxford called at my place of business North Oxford so called and stated that a liquor license to Peter J. Degnan could not be secured but stated that one Benjamin Leary, Green Street, Worcester, Massachusetts, could secure the license. At a later interview at the Court House Worcester he named the amounts necessary to procure the license as follows: Robert T. Powers    $200.00    Henry L. Gendron 150.00    Arthur A. Keith [sic]    25.00    375.00    At a later date Sheriff Keith [sic] called at my home representing that the license had been granted and collected from me the sum of $25.00. Up to the present time no license has been granted to me." Peter Degnan did not tell the defendants that the $25 payment was a gratuity, and so

far as appears the defendants never heard this from any source. The defendants "must have understood" that the license referred to in each affidavit was an "all alcoholic" license, because they knew that they themselves had granted the "beer and wine" license to Dorothy Degnan. Johnson made no further investigation to determine the truth of Peter Degnan's affidavit. Early in June there was a town election to fill a vacancy in the board of selectmen. The plaintiff and the defendant Johnson engaged in a bitter exchange of words at the voting place. About June 13 Johnson told the town solicitor what Degnan had stated and showed him the affidavits. The solicitor advised him to lay the matter before the judge of the District Court of the district. The two defendants then had a conference with the judge at the Court House and showed him Peter Degnan's affidavit. At the judge's suggestion they brought Degnan to the Court House, where the judge questioned him. Degnan stated that the contents of the affidavits were true. The judge relied upon "the affidavit" and upon Degnan's assurance that its contents were true. He was not told of the ill feeling between the defendants and the plaintiff, nor was he told that the "beer and wine" license had been granted to Dorothy. At the conclusion of the conference the judge said to the clerk, who had been present during at least part of the interview, "You may make out a complaint." Degnan and the clerk then passed into the clerk's office, where after asking Degnan some further questions the clerk prepared the complaint. It is not found that either of the defendants was named as the complainant. At the trial in the District Court on the complaint the present plaintiff was represented by counsel, but the Commonwealth was not. Degnan when called to the stand told the court that he was not interested in prosecuting the complaint; that it was instigated by the defendants, who had more interest in the matter than he had. The judge asked if there was anyone else who wished to testify, looking in the direction of the defendants. Neither they nor the plaintiff said anything, and the judge pronounced the plaintiff not guilty. From his observation of

Peter Degnan at the hearing the auditor found that he was "a man of less than average mentality and of unstable character."

Probable cause has been defined in this Commonwealth as "such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested is guilty." *Bacon* v. *Towne,* 4 Cush. 217, 238–239. *Ellis* v. *Simonds,* 168 Mass. 316, 326. *Burick* v. *Boston Elevated Railway,* 293 Mass. 431, 433–434. Compare Am. Law Inst. Restatement: Torts, § 662. "Probable cause does not depend on the actual state of the case, in point of fact, but upon the honest and reasonable belief of the party commencing the prosecution." *Bacon* v. *Towne,* 4 Cush. 217, 239. *Lewis* v. *Goldman,* 241 Mass. 577, 578–579. The plaintiff has the burden of proving lack of probable cause, although that is a negative proposition. *Bacon* v. *Towne,* 4 Cush. 217, 237. *Cheever* v. *Sweet,* 151 Mass. 186, 187. It has been said repeatedly that when the facts are fully established or undisputed, probable cause becomes a question of law. *Casavan* v. *Sage,* 201 Mass. 547, 553. *Griffin* v. *Dearborn,* 210 Mass. 308, 312–313. *Bannon* v. *Auger,* 262 Mass. 427, 435. In the cases at bar, however, although the auditor's report establishes the subsidiary facts found by him, a wide field still lies open for the drawing of inferences, so that, in the light of what has already been said as to the effect of the auditor's findings, we do not regard the issue now before us as purely a question of law. See *Londy* v. *Driscoll,* 175 Mass. 426. We do not intimate that a different result would be reached if the question had been reduced to one of law.

Passing as we must upon the issue of fact, on all the specific findings with proper inferences therefrom it does not seem to us that the conclusion of lack of probable cause ought to be drawn. It now fully appears that the plaintiff was not guilty of the charge against him. But the matter must be judged in the light of the situation as it presented itself to the defendants at the time of the institution of the complaint. There is force in the plaintiff's argument that

he would be unlikely to deceive or to attempt to deceive the Degnans upon a matter so readily ascertainable as the issuance or denial of the "all alcoholic" license needed in order to lease the tavern to Leary, and the affidavits, drawn up it would seem by laymen, lack somewhat in definiteness and consistency. On the other hand the defendants, having heard that Peter Degnan had paid money in connection with a matter which might vitally affect their own reputations, naturally and reasonably proceeded to the Degnan home as the place where information could be procured. The information obtained both from Peter and from Dorothy did tend to incriminate the plaintiff. The defendants took the precaution to obtain affidavits. Peter's hesitancy to sign might well be due to reasons other than falsity of his statements. It does not appear that the defendants urged him to sign or exercised any pressure upon him. Of course it is possible that the Degnans, who knew of the enmity between the defendants and the plaintiff, made false and misleading affidavits in order to curry favor with the defendants as the licensing officials, although nothing was said on that subject to or by the defendants. The defendants, however, were not bound to anticipate such conduct on the part of the Degnans. The payment of money to the plaintiff as a "gratuity" was a thing outside the normal course of events. Such an explanation of the payment would not be likely to occur to persons making an investigation. The defendants might reasonably expect the Degnans to tell them that the payment was a gratuity instead of signing and swearing to the affidavits. The Degnans did not tell the defendants. It is argued that the defendants should have inquired further. But it is hard to see of whom it can fairly be said they should have inquired. Their relations with the plaintiff made inquiry of him difficult. It does not appear that the defendants knew that Peter Degnan had a lawyer, or that they had any reason to suppose that Leary knew about the payment of the $25; nor does it appear that in fact Leary did know.

But in our view the facts most favorable to the defendants are those relating to the placing of the information

which they had before the judge and his action in relation to it. They seem to have made a fair disclosure. Their failure to tell the judge of the ill feeling between themselves and the plaintiff was of little or no materiality. The judge relied upon Peter Degnan. The granting of the "beer and wine" license to Dorothy Degnan was not material. The affidavits did not relate to that license. The judge took the matter into his own hands. Not only did he read Peter's affidavit and also know of Dorothy's (if he did not read it), but on his own initiative he questioned Peter in person. So far as appears the defendants did not insist upon the issuance of a complaint, nor did they make any false or fraudulent statements. It is a reasonable inference that Peter Degnan and not the defendants actually made the complaint. The subsequent course of the trial, and the failure to introduce evidence against the plaintiff seems to have resulted from Degnan's change of heart after the making of the complaint. There was little the defendants could have done about this. Whatever may be said of Degnan's mentality, he impressed the judge sufficiently to cause the latter to direct the making out of the complaint. While it has never yet been decided in this Commonwealth that the opinion of the judge of a district court upon the making of a complaint "is equivalent as a protection to the advice of a counsellor at law, retained by the prosecutor and acting under the usual responsibility to his client and to the courts," it is at least evidence to be considered upon probable cause. *Monaghan* v. *Cox*, 155 Mass. 487, 492. See *Burnham* v. *Collateral Loan Co.* 179 Mass. 268, 274.

It is argued that the defendants did not believe that the plaintiff was guilty. Belief by the defendant in the guilt of the plaintiff has been held to be a necessary part of probable cause. *Bacon* v. *Towne*, 4 Cush. 217, 239. *Krulevitz* v. *Eastern Railroad*, 140 Mass. 573. *Connery* v. *Manning*, 163 Mass. 44. But belief in this connection must mean something short of certainty. Absolute certainty is not required even for a conviction on the criminal charge. Am. Law Inst. Restatement: Torts, § 662, comment c. For reasons already stated we are not satisfied that an inference that

the defendants did not entertain to the extent required for probable cause a belief in the plaintiff's guilt should be drawn from the specific findings of the auditor. The fact that the defendants were hostile to the plaintiff would scarcely make them less likely to believe evidence against him.

There was much to support an inference that the defendants acted with malice towards the plaintiff, but lack of probable cause cannot be inferred from malice, *Griffin* v. *Dearborn,* 210 Mass. 308, 312, and must be shown, even though malice appears. *Bannon* v. *Auger,* 262 Mass. 427, 436.

We need not discuss the further issue whether the defendants did in fact participate in causing the prosecution of the plaintiff.

*Exceptions overruled.*